UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES, on behalf of and for the benefit of THE SMITHSONIAN INSTITUTION,<br><br>Petitioner. | )<br>)<br>)<br>)  Civil Action No. 17-mc-3005 (TSC)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

The United States on behalf of the Smithsonian Institution ("the Smithsonian") seeks modification of a 101-year-old agreement under the equitable doctrine of cy pres. For the reasons set forth below, the court will GRANT the United States' Petition for Modification of the Agreement.

### I. INTRODUCTION

The Smithsonian was created in 1846 by an act of Congress "for the increase and diffusion of knowledge among men." 20 U.S.C. § 41. In 1920, the Smithsonian acquired 2,241 items from the Ward family ("the Ward Collection"), including ethnographic objects that were collected by Herbert Ward, a British explorer and artist, as well as nineteen bronze sculptures he had made of the Congolese people ("the Ward Sculptures"). ECF No. 2-2, Arnoldi[1] Decl. ¶ 4. Four of the sculptures are heroic-sized; six are life-sized; and the remainder are half-sized or fragments of statues. *Id.* Each of the heroic- and life-sized sculptures weighs up to 800 pounds and has a base of up to 250 pounds. *Id.*

The Smithsonian obtained these items through an agreement ("the Agreement") with

---

[1] Dr. Mary Jo Arnoldi has a Ph.D. from Indiana University and has worked for the Smithsonian's Department of Anthropology at the National Museum of Natural History as a research anthropologist and curator for African ethnology since 1984.

Herbert Ward's widow, Sarita Ward. *Id.* The Agreement expresses the Wards' desire that the Ward Collection be exhibited in a manner such that "its educational advantages and uses might be properly fulfilled." ECF No. 1-1, Ex. 1. In accepting the Ward Collection, the Smithsonian agreed, among other things, that the ethnographic objects and sculptures "shall always be kept with the rest of the [Ward] Collection," that the Ward Collection shall "always be kept in a room or in a reasonably conspicuous part of the building of the Smithsonian Institution," and that the Ward Collection "shall be open to the public at all times when the Smithsonian Institution . . . is so open." *Id.* at (a), (f). The Agreement does not contain a "gift over" provision providing for the alternative disposition of the Ward Collection in the event that the provisions of the Agreement can no longer be followed. ECF No. 2-3, Pet. Statement of Undisputed Material Facts ¶ 7.

The Ward Collection was displayed for decades at the National Museum of Natural History ("the Museum"), a Smithsonian museum along the National Mall in Washington, D.C. Arnoldi Decl. ¶¶ 2, 5. In 1960, the Museum decided that it was impracticable to permanently display the Ward Collection. *Id.* ¶ 6. Accordingly, the Smithsonian filed a petition to modify the Agreement. *Id.* On May 9, 1961, the court granted the petition, thereby allowing the Smithsonian to exhibit the ethnographic objects separately from the sculptures, to remove some of the ethnographic objects from permanent display, and to display some of the ethnographic objects along with items from other collections. ECF No. 1-2, Order at (a), (b), (c) ("the 1961 Order"). After the court modified the Agreement, the Museum moved some of the ethnographic objects to storage. Arnoldi Decl. ¶ 7. Other ethnographic objects from the Ward Collection were moved to a new exhibition, *The Cultures of Africa*, and the Ward Sculptures were displayed in the Rotunda on the first and second floors of the Museum. *Id.*

In the late 1980s, the Museum began to renovate its facilities and several older exhibitions. *Id.* ¶¶ 7–8. During this period, the Museum also began receiving criticism for the negative stereotypes of African societies and culture portrayed by the Museum's African cultural displays. *Id.* ¶¶ 8, 21. The Ward Sculptures in particular became the subject of criticism from both scholars and members of the public. Due to the renovations and growing criticism of the Ward Sculptures, in 1988 the Museum removed the ten large Ward Sculptures from public display under the mistaken belief that the 1961 Order relieved the Museum of its obligation to place all pieces in the Ward Collection on continuous physical display. *Id.* ¶ 8.

In 1992, the Museum closed *The Cultures of Africa* exhibition and began planning a new exhibition, *African Voices*. *Id.* ¶ 9. In planning this new exhibition, the curators decided that the central voices of the exhibition should be African and African American and therefore decided not to include the Ward Sculptures, many of which depict African societies from a European perspective. *Id.* ¶ 21.

In 2014, Timothy Le Grice, a descendant of Herbert and Sarita Ward, contacted the Museum to inquire why the Museum had removed the Ward Sculptures from public display. *Id.* ¶ 11. On January 20, 2017, Dr. Richard Kurin, then-Acting Provost of the Smithsonian, sent Le Grice a letter explaining that the Smithsonian had no plans to physically exhibit the sculptures but that photographs of the sculptures were available online and that the Museum was planning to create an online exhibition of the sculptures. *Id.* at Ex. C.

The United States filed its petition for further modification of the Agreement on November 13, 2017. It asked the court to release the Smithsonian of its obligation to continuously display the Ward Sculptures at the Museum or other Smithsonian building, Pet. for Modification at 11, and filed a motion for summary judgment on March 5, 2018, ECF No. 2,

Pet.'s Mot. for Summ. J.  The court denied that motion on June 26, 2018 and ordered the United States to file a notice detailing any efforts it made or intended to make to notify the Ward heirs of the pending petition for modification.  ECF No. 3, Order on Pet.'s Mot. for Summ. J.  The United States filed its notice on July 13, 2018, asserting that it is not required to provide such notice to the Wards' heirs.  Nevertheless, the United States emailed two of the Wards' heirs with whom the Museum's curator of African ethnology has been in contact in recent years to inform them that the Smithsonian intended to file a petition for modification and published a notice in a national newspaper.  ECF No. 4-1, Decl. of Counsel ¶¶ 2–3, 5.

James Barclay, a great grandson of Herbert Ward, has filed an objection to the petition for modification, noting that "[t]he Smithsonian has already made one variation in 1961 . . . and [should] find the necessary space to display the collection of the sculptures."  ECF No. 5-1, Barclay Decl. ¶ 2.  In his view, "[i]t seems that [t]he Smithsonian may[] be attaching too much importance to a handful of unrecorded complainants that the sculptures are 'stereo-typical,' and therefore should be removed from view."  *Id.* ¶ 3.  In any event, he contends that if the items in the Ward Collection are placed in storage, the Smithsonian "should also be required to produce a more comprehensive website showing all the items in the collection in one place."  *Id.* ¶ 4.

Barclay is not represented by counsel—his filing was submitted to the court by the Smithsonian.  *See* ECF No. 5, Notice of Filing.  Nevertheless, the court construes this filing as a motion to intervene.

## II. ANALYSIS

### A. Motion to Intervene

As an initial matter, the court finds that neither Barclay, nor any other of the Wards' heirs have a right to intervene.  The Agreement does not contain a "gift over" provision providing for the alternative disposition of the Ward Collection in the event the provisions of the Agreement

4

could no longer be followed and so the Wards' heirs have no reversionary interest in the Ward Collection. ECF No. 4, Notice; Pet.'s Statement of Undisputed Material Facts ¶ 7; s*ee In re United States ex rel. The Smithsonian Inst.*, No. 13-mc-1454, 2019 U.S. Dist. LEXIS 127495, at *33 (D.D.C. July 10, 2019) ("Unless they include clear language to the contrary, testamentary gifts do not create reversionary interests."). Absent a reversionary interest in the property, a settlor's heirs do not have standing to intervene in a trust's application for cy pres. *Smithsonian Inst.*, 2019 U.S. Dist. LEXIS 127495, at *33. Normally, the D.C. Code requires a petitioner seeking the application of cy pres to provide notice of a judicial proceeding in compliance with the applicable rules of civil procedure. *See* D.C. Code § 19-1301.09(d) (2020). However, because the Wards' heirs do not have standing to intervene, the Federal Rules of Civil Procedure do not require the United States to provide notice. Fed. R. Civ. P. 4.

### B. Petition for Modification

The government argues that the court should modify the Agreement because it is impracticable to comply with the Agreement's continuous physical display requirement and that relieving the Museum of its obligation is consistent with the Agreement's charitable purpose. Pet.'s Mot. for Summ. J. at 13. It claims that compliance is impracticable for three reasons. *Id.* at 14. First, the government asserts that in the one hundred years since the Agreement was signed, the scope of the Museum's collection of artifacts has grown significantly, while its footprint has remained constant. *Id.* Second, the Museum no longer accepts donations that carry a continuous physical display requirement. *Id.* at 14–15. And third, the continuous physical display of the Ward Sculptures is inconsistent with the Smithsonian's mission because the sculptures portray outdated colonial stereotypes. *Id.* at 15. The government further argues that because the Ward Sculptures were intended to be used for educational purposes, relieving the Museum of the continuous physical display requirement and allowing it to exhibit the Ward

Sculptures online will allow the Museum to provide historical context for the sculptures and allow the exhibit to reach visitors nationally and internationally. *Id.* at 17–18.

The court agrees that modification of the Agreement pursuant to the equitable doctrine of cy pres is appropriate in this case. A court may apply cy pres to modify the substantive provisions of a trust if (1) the trust has a charitable purpose, (2) compliance with the substantive provisions of the trust has become unlawful, impracticable, impossible to achieve, or wasteful, and (3) the proposed modification is as near as possible to the settlor's charitable purpose. D.C. Code § 19-1304.13 (2021); *Treasurers of the Corcoran Gallery v. District of Columbia*, 2014 D.C. Super. LEXIS 17, at *35–36 (D.C. Super. Ct. 2014). Cy pres may also be applied to instruments like the Agreement, which do not contain words that explicitly create a trust, if the instrument conveys a charitable purpose. *Conn. Coll. v. United States*, 276 F.2d 491, 495 (D.C. Cir. 1960) ("It is generally held that a charitable trust may be created by an instrument which does not contain words of trust . . . if its language indicates a charitable purpose on the part of the testatrix.").

1. Charitable Purpose

The Agreement has a charitable purpose—that the Ward Collection be used to educate others. An instrument conveys a charitable purpose if the purpose of the donation is to confer a public benefit. *Noel v. Olds*, 138 F.2d 581, 585 (D.C. 1943). In making this determination, the court should construe the language of the instrument liberally. *Id.* at 584–85 (citing *Ould v. Washington Hosp. for Foundlings*, 95 U.S. 303, 313 (1877)).

Here, the Agreement specifies that the items in the Ward Collection be exhibited in a manner such that "its educational advantages and uses might be properly fulfilled." Ex. 1. Educating others is undoubtedly a public benefit, and therefore, the Agreement has a charitable

purpose.

Although the original version of the Agreement requires the ethnographic objects and sculptures to be kept "together" to effectuate that charitable purpose, the court found that such display specifications are incidental to the charitable purpose when it relieved the Museum of that requirement in the 1961 Order.

The lack of a "gift over" provision in the Agreement is further evidence that the Wards intended the items be used to benefit the public and that any display requirements were incidental to the charitable purpose. *Cf. In re Elizabeth J.K.L. Lucas Charitable Gift*, 261 P.3d 800, 810 (Haw. Ct. App. 2011) (finding presence of a "gift over" provision confirms that the "settlor only wished to dedicate the property to a specific purpose and, if that specific purpose failed, to not dedicate it to charity at all"). Therefore, the court may modify the provisions of the Agreement so long as compliance with the current provisions is unlawful, impossible, impracticable, or wasteful, and the proposed modifications are consistent with the purpose of educating others.

2. <u>Impracticability</u>

To establish impracticability, a party must demonstrate that it would be "unreasonably difficult" to comply with the current provisions of a trust. *Treasurers*, 2014 D.C. Super. LEXIS 17, at *38–39. A court may not modify the current provisions merely to "meet the desire and suit the convenience of the trustee." *Conn. Coll.*, 276 F.2d at 497. However, it may find that compliance with the current provisions is impracticable "even where it is not a literal impossibility." *In re United States ex rel. The Smithsonian Inst.*, No. 13-mc-1454, 2019 U.S. Dist. LEXIS 127495, at *42 (D.D.C. July 10, 2019).

Compliance with the provision of the Agreement requiring that the Ward Sculptures

7

"always be kept in a room or in a reasonably conspicuous part of the building of the Smithsonian Institution" is impracticable. Ex. 1 at (a). Compliance with the Agreement is "unreasonably difficult" in light of the Museum's space constraints, the Museum's own policies, contemporary museum practices, and the content of the sculptures.

The Museum's exhibition space is limited. Over the past century, the Museum's footprint has essentially remained the same, while its collection of artifacts has grown significantly. Arnoldi Decl. ¶ 17. Moreover, because ten of the nineteen Ward Sculptures are heroic- or life-sized and weigh over one thousand pounds, the sculptures occupy a relatively large portion of the Museum's limited real estate. Dedicating such a significant amount of space to one collection prevents the Museum from displaying other items that reflect the evolution of cultural and societal concerns. *Id.* Displays that reflect such concerns are critical to the Smithsonian's mission—promoting the "increase and diffusion of knowledge among men." 20 U.S.C. § 41. The Museum cannot simultaneously comply with the Agreement and properly effectuate its mission without additional exhibition space. Thus, although it is possible to physically display the Ward sculptures in perpetuity, compliance with such a requirement would be "unreasonably difficult" and be to the detriment of the mission assigned to the Smithsonian by Congress.

The provision also conflicts with the Museum's current policy not to accept any donations that carry a continuous physical display requirement. When a provision of a trust conflicts with the trustee's own policies such that enforcement of the provision would interfere with the trustee's mission, compliance with the provision may be impracticable. *See United States ex rel. United States Coast Guard v. Cerio*, 831 F. Supp. 530, 535, 540 (E.D.V.A. 1993) (finding enforcement of a trust providing an annual award between $65,000 and $130,000 to a

single cadet, far exceeding the trustee's policy to provide awards of up to $300, would interfere with the trustee's mission to educate and instill a "high sense of honor, loyalty and obedience"). As discussed above, the Museum's mission is to educate its visitors, and exhibitions that reflect contemporary cultural and societal concerns are necessary to accomplish that goal. Consequently, enforcement of the Agreement which requires the Museum to continue to display a collection which has already been exhibited for nearly a century interferes with the Museum's mission and is therefore impracticable.

The burden imposed by a continuous physical display requirement given the Museum's space constraints and the size of the Ward sculptures is exacerbated by contemporary museum practices and the content of the sculptures.

When a provision in a trust conflicts with an industry practice, cy pres may be applicable. *Smithsonian Inst.*, 2019 U.S. Dist. LEXIS 127495, at *59–60 (finding enforcement of a provision requiring a particular collection of insects to be kept separately from other specimens of that species, in contradiction of industry practice that requires specimens to be arranged taxonomically, to be "wasteful" because it forced researched to make double the number of trips to retrieve specimens and used extra storage space). Here, requiring the Smithsonian to comply with the Agreement in light of existing industry practices is "unreasonably difficult." Contemporary museum practice requires that museums supplement their exhibitions with "stories, context, and relevance." Arnoldi Decl. ¶ 18. The need to provide context for the Ward Sculptures is particularly important given that the sculptures reflect early twentieth century European social and scientific attitudes toward African societies that "classified Africans as 'savages' in a state of social, artistic, and religious backwardness." *Id.* ¶¶ 1, 20. However, museums require additional exhibition space to provide such supplemental information, and it is

9

impossible to provide sufficient context to address the negative stereotypes portrayed by the Ward Sculptures given the Museum's space constraints. *Id.* ¶ 13. If the Museum were to display the Ward Sculptures without providing such context, the exhibit would not reflect contemporary cultural and societal concerns and would therefore be inconsistent with the Museum's mission. Consequently, it is "unreasonably difficult" to comply with both the continuous physical display requirement specified in the Agreement and contemporary museum practices.

A continuous physical display requirement also conflicts with the contemporary museum practice requiring exhibitions to be "regularly rotated and updated." Arnoldi Decl. ¶ 18. Continuously displaying the Ward Sculptures, rather than rotating them with other exhibitions, violates this practice and again interferes with the Museum's mission for the reasons discussed above.

For the foregoing reasons, the court finds that compliance with the Agreement's provision requiring continuous physical display of the Ward sculptures is impracticable.

3. Proposed Modifications

A court may only modify a provision if the proposed modification is as near as possible to the settlor's charitable purpose. D.C. Code § 19-1304.13 (2021). Relieving the Museum of its obligation to physically display the Ward Sculptures in perpetuity and instead permitting the Museum to display the sculptures online is consistent with the Wards' intent that the sculptures be used for educational purposes. Displaying the Ward Sculptures online still enables their "educational advantages and uses [to] be properly fulfilled." Ex. 1. An online exhibition provides visitors with access to more material than otherwise possible if the Ward Sculptures were displayed at the Museum because an online exhibition, unlike a physical exhibition, is not subject to space constraints. Therefore, by creating an online exhibition of the Ward sculptures,

the Museum can provide the necessary historical context to explain that the sculptures portray outdated, colonial stereotypes of African persons in addition to supplemental information about Herbert Ward's life. Arnoldi Decl. ¶ 13. Moreover, virtual visitors from across the globe will have the opportunity to view the Ward Collection because an online exhibition allows the Museum to reach more people than a physical exhibition. Therefore, allowing the Museum to display the Ward sculptures online is as near as possible to the Wards' intent that the sculptures be used for educational purposes.

### III. CONCLUSION

For the reasons set forth above, the court will GRANT the United States' Petition for Modification of the Agreement.

Date: August 2, 2021

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge